**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

| | |
|---|---|
| **LILLY GRACE DUNCAN and OLIVIA CLARK,**<br>**Plaintiffs,**<br><br>     **vs.**<br><br>**ASHEVILLE ACADEMY FOR GIRLS, LLC (f/k/a SOLSTICE EAST, LLC and MAGNOLIA MILLS SCHOOL), WILDERNESS TRAINING & CONSULTING, LLC (d/b/a FAMILY HELP AND WELLNESS), and JOHN DOE ENTITIES 1-10,**<br>**Defendants.** | **Case No. _____**<br><br><br><br>**COMPLAINT AND JURY DEMAND** |

## PLAINTIFFS' COMPLAINT FOR DAMAGES

COME NOW Plaintiffs, Lilly Grace Duncan and Olivia Clark, by and through counsel, and respectfully allege as follows:

## I. INTRODUCTION

1.      This action arises from the systematic abuse, neglect, exploitation, and forced labor of minor residents at a residential treatment facility that operated under multiple names including Solstice East, Magnolia Mills School, and ultimately Asheville Academy for Girls. Plaintiffs, who were vulnerable minors placed in Defendants' care for therapeutic treatment, instead suffered severe physical, emotional, and sexual abuse, as well as being subjected to forced labor for the economic benefit of the facility, all of which has caused lasting psychological harm.

2.      Defendants operated a facility that prioritized control and economic exploitation over genuine therapeutic care, employed unqualified staff, failed to protect residents from sexual exploitation, provided alcohol to minors, subjected residents to punitive isolation measures,

systematically covered up reports of abuse, and forced minor residents to perform extensive unpaid labor that provided economic benefit to the facility.

## II. PARTIES

3.  **Plaintiff LILLY GRACE DUNCAN ("Ms. Duncan")** is an 18-year-old resident of Corpus Christi, Texas, born September 21, 2006. At all relevant times during her residency at Defendants' facility, from January 24, 2023 to May 4, 2024, she was a minor.

4.  **Plaintiff OLIVIA CLARK ("Ms. Clark")** is a 19-year-old resident of Fenwick Island, Delaware, born April 12, 2006. During her residency at Defendant's facility, from October 3, 2023, to May 22, 2024, she was a minor for the initial portion of her stay, reaching the age of majority on April 12, 2024, while still residing at the facility.

5.  **Defendant ASHEVILLE ACADEMY FOR GIRLS, LLC** (formerly known as Solstice East, LLC and Magnolia Mills School) is a North Carolina limited liability company that at all relevant times operated a residential treatment facility for adolescent girls located at 530 Upper Flat Creek Road, Weaverville, North Carolina 28787-8331.

6.  **Defendant WILDERNESS TRAINING & CONSULTING, LLC** (d/b/a "Family Help and Wellness") is an Oregon limited liability company with its principal place of business at 530 Center Street NE, Suite 700, Salem, Oregon 97301. Wilderness Training & Consulting, LLC owns and operates Asheville Academy for Girls and is the parent company responsible for the policies, procedures, and operations of the facility.

7.  **Defendants JOHN DOE ENTITIES 1-10** are entities, including but not limited to insurance companies, management companies, and other business entities, whose identities are presently unknown to Plaintiffs but who may be liable for the acts and omissions alleged herein.

## III. JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331

(federal question jurisdiction) based on Plaintiffs' claims under 42 U.S.C. § 1983, the Fair Labor

Standards Act (29 U.S.C. § 201 et seq.), the Trafficking Victims Protection Act (18 U.S.C. §§

1589, 1590), and the Thirteenth Amendment to the United States Constitution.

9.      This Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant

to 28 U.S.C. § 1367.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving

rise to this action occurred in this judicial district.

11.      Personal jurisdiction over Defendants exists because they conducted business, committed

tortious acts, and caused injury to Plaintiffs within North Carolina.

## IV. FACTUAL ALLEGATIONS

### A. Background and Admission

12.      Plaintiffs were admitted to the Defendants' residential treatment facility as vulnerable

minors in need of therapeutic care and support for mental health issues.

13.      Ms. Duncan was transported to the facility against her will on January 24, 2023, via a

"transport service" and remained there until May 4, 2024, a total of 466 days.

14.      Ms. Clark was admitted to the facility on October 3, 2023, and remained until May 22,

2024, a total of 232 days.

15.      During their respective stays, the facility underwent multiple rebranding from Solstice East

to Magnolia Mills School to Asheville Academy for Girls, creating instability and confusion

among residents.

16.      Defendants represented their facility as a therapeutic residential treatment center that would

provide appropriate mental health treatment, educational services, and a supportive environment.

17.     Plaintiffs' parents paid substantial sums for this purported treatment, believing it would help their daughters address their mental health needs.

**B. Pattern of Systematic Abuse and Neglect**

### 1. Punitive Isolation and Psychological Abuse

18.     Defendants employed a system of punitive isolation measures disguised as therapeutic "interventions" that served as punishment and control mechanisms, including:

19.     "Safety" interventions where residents were prohibited from speaking to anyone, including their therapists, and were required to remain within arm's length of a staff member at all times. While Defendants' handbook stated such measures could last no longer than 72 hours, Plaintiffs were frequently subjected to these restrictions for extended periods exceeding the stated maximum.

20.     "Self-focus" interventions that prohibited residents from communicating with any other residents or staff.

21.     "Call restrictions" that prevented residents from contacting their families, particularly when they expressed negative views about the program.

22.     A coercive environment where residents were punished rather than supported when they honestly disclosed negative thoughts or feelings.

23.     Implementation of a "competencies" system that assigned numerical values to residents' mental health status and progress, creating a shame-based environment that fostered perfectionism and anxiety rather than genuine healing.

### 2. Sexual Exploitation and Abuse

24.     Defendants failed to protect Ms. Duncan from sexual exploitation by a former staff member identified as "Gabe."

25.     Gabe worked closely with Ms. Duncan during the first several months of her stay, establishing a relationship of trust and mentorship.

26.     After leaving Defendants' employment, Gabe initiated inappropriate contact with Ms. Duncan during her authorized leaves of absence when she had access to her phone and social media.

27.     This contact escalated to sexual content, with Gabe soliciting and receiving inappropriate photographs from Ms. Duncan, who was still a minor and still a resident at the Defendants' facility.

28.     Gabe explicitly acknowledged to Ms. Duncan that he had harbored inappropriate feelings for her during his employment, stating that he "would always look at [her] ass or other parts of [her] body" while she was under his care.

29.     When another resident reported this inappropriate relationship to staff member Hannah Rees, who attempted to report it to the facility via text message, Defendants instructed Hannah to "block the number" and not respond further.

30.     Defendants deliberately failed to investigate this serious allegation or report it to Ms. Duncan's parents or proper authorities, constituting gross negligence and a failure to protect a minor in their care.

### 3. Provision of Alcohol to Minors

31.     On or about April 6, 2024, staff member "Jami Taylor" provided Ms. Clark with Gatorade containing vodka.

32.     When Ms. Clark immediately tasted alcohol and reported it to another staff member, Jami was terminated from employment.

33.     Despite terminating Jami, the Defendants' administration attempted to lie and manipulate Ms. Clark by claiming there was no alcohol in the beverage, even though the staff member had been fired for this exact conduct.

34.     This incident caused Ms. Clark and other residents to feel unsafe and lose trust in the staff supposed to care for them.

### 4. Sexual Harassment by Staff

35.     Staff member "Scott" regularly made inappropriate sexual comments about residents' bodies and failed to maintain appropriate professional boundaries.

36.     Scott would make sexual comments about residents and engaged in inappropriate behavior, creating a hostile and unsafe environment.

### 5. Medical Neglect

37.     Defendants consistently failed to provide appropriate medical care to residents, including:

38.     Refusing to take residents to medical facilities even in emergency situations, including when a resident suffered a seizure and fell downstairs.

39.     Regarding Ms. Duncan: Ignoring her repeated requests for medical attention for back pain, providing only inadequate physical therapy. Since leaving the facility, Ms. Duncan has been diagnosed with a leg length discrepancy causing her back pain and has been prescribed orthotics for treatment.

40.     Regarding Ms. Clark: Refusing to take her to a doctor when she was severely ill for a week, only providing medical care after her mother angrily emailed the facility.

41.     Failing to provide appropriate psychiatric care for residents with serious mental health issues.

### 6. Forced Labor and Economic Exploitation

42.     Defendants systematically exploited Plaintiffs and other minor residents by requiring them to perform extensive unpaid labor through a formalized system of mandatory "Community Roles" and daily chores that provided direct economic benefit to the facility.

43.     **Formalized Labor System**: Defendants operated a comprehensive unpaid labor program disguised as therapeutic programming, including: (a) Sixteen (16) distinct "Community Roles" with detailed job descriptions equivalent to paid positions (b) Formal training requirements where outgoing residents trained their replacements (c) A systematic "check system" for monitoring work performance (d) Staff oversight and approval processes for job assignments

44.     **Daily Labor Requirements** included: (a) **Room Maintenance**: Making beds, organizing shelves, cleaning bathrooms (including toilets, showers, mirrors), vacuuming, trash removal, and maintaining "tour ready" standards (b) **Kitchen Operations**: Food preparation and service, operating salad and hot bars, washing dishes and trays, cleaning surfaces, sweeping, mopping, emptying "wells" from hot bars requiring multiple bucket loads, and restocking supplies (c) **Facility Maintenance**: Cleaning common areas, vacuuming carpets, sweeping hardwood floors, disassembling and cleaning furniture, window cleaning, and general facility upkeep (d) **Laundry Operations**: Creating and implementing facility-wide laundry schedules, providing equipment instruction, monitoring detergent supplies, and maintaining laundry facilities

45.     **Specialized Labor Roles** that replaced paid staff positions: (a) **Chef**: Meal preparation, serving snacks to all residents, organizing weekend lunches, and preparing adventure day pack-outs (b) **Maintenance Supervisor ("Swiffer")**: Managing all cleaning supplies, mixing

chemicals, monitoring inventory, and coordinating restocking (c) **Quality Control Inspector**: Conducting morning room inspections with staff, teaching job performance standards, monitoring work completion, and ensuring "tour ready" facility conditions (d) **Facility Coordinator ("Job Coordinator")**: Training residents in work duties, assigning daily and weekly cleaning jobs, and ensuring proper job completion

46.     **Animal Care and Agricultural Labor**: (a) Daily barn chores including feeding hay, providing water and grain to horses, and mucking pastures (b) Specialized "Wrangler" positions requiring additional training and responsibilities (c) Creating and managing daily feeding schedules for morning, evening, and weekend feeds (d) Pasture maintenance including removing harmful plants and relocating manure piles (e) General animal care that would typically require paid agricultural workers

47.     **Weekend Deep Cleaning Operations**: Residents performed intensive facility-wide deep cleaning including: (a) Complete room sanitization including bathroom deep cleaning (b) Kitchen deep cleaning including appliance maintenance and expired food removal (c) Common area intensive cleaning including furniture disassembly and window washing (d) Supply management and facility organization

48.     **Economic Roles and Administrative Functions**: (a) **Supply Management**: Monitoring and restocking cleaning supplies, laundry detergent, and facility materials (b) **Scheduling Coordination**: Managing phone call schedules, adventure outing logistics, and team activities (c) **Safety and Compliance**: Ensuring proper dress codes, managing facility lighting, recycling coordination, and energy conservation (d) **Educational Support**: Tutoring other residents and organizing academic materials

49. **No Compensation**: Despite performing work equivalent to multiple paid staff positions including food service workers, custodial staff, agricultural workers, administrative assistants, and facility coordinators, Plaintiffs and other residents received no wages, compensation, or educational credit for this labor.

50. **Punitive Enforcement**: Residents who failed to perform assigned labor tasks faced systematic punishment through Defendants' "intervention" system, including: (a) A formal three-strike "check system" with escalating consequences (b) Isolation and loss of privileges for non-compliance (c) Mandatory improvement plans developed with staff oversight (d) Public accountability measures in team meetings

51. **Economic Benefit to Defendants**: The unpaid labor performed by residents directly replaced paid employees and reduced Defendants' operational costs for: (a) Food service and kitchen operations equivalent to multiple food service workers (b) Custodial and maintenance services equivalent to full-time cleaning staff (c) Agricultural and animal care services equivalent to stable hands and farm workers (d) Administrative and coordination services equivalent to facility management staff e. Specialized roles including quality control, supply management, and facility coordination

52. **Commercial-Grade Standards**: The labor requirements imposed commercial-level standards including maintaining facilities in "tour ready" condition at all times, suggesting the work served commercial rather than therapeutic purposes.

53. **Labor Disguised as Therapy**: Defendants misrepresented this systematic forced labor as "Community Roles" designed to promote "positive peer culture," when in reality the program served primarily to reduce facility operating costs by replacing paid staff with unpaid minor residents.

### 7. Unsafe and Unsanitary Living Conditions

54. The physical environment was inadequate for therapeutic care, including:

55. Overcrowded living spaces where four residents shared small rooms with minimal privacy.

56. Poor maintenance of the facility, including holes in floors caused by water damage and mold.

57. Inadequate food preparation and service, with residents often not receiving sufficient food.

### 8. Negligent Hiring, Training, Supervision, and Retention

58. Defendants employed staff members who were unqualified to work with vulnerable adolescents with complex mental health needs.

59. Defendants failed to properly screen, train, and supervise staff members, resulting in the employment of individuals who:

Provided alcohol to minors (Jami Taylor)

Sexually exploited residents (Gabe)

Made inappropriate sexual comments (Scott)

Used illegal substances on campus

60. Defendants maintained inadequate staffing ratios, particularly during overnight hours, compromising resident safety.

61. Defendants failed to remove staff from the facility despite having actual or constructive knowledge of staff members' inappropriate conduct, incompetence, or unfitness to perform therapeutic care to vulnerable minors.

### 9. Violation of Own Policies and Procedures

62. Defendants routinely violated their own written policies, including:

63. Exceeding the 72-hour maximum for "safety" interventions as stated in their handbook.

64. Failing to follow proper reporting procedures for suspected abuse as outlined in their policies.

65. During the rebranding process, Defendants confiscated all resident handbooks, preventing residents from knowing their rights or holding the facility accountable to its stated policies.

## C. Specific Harm to Plaintiffs

### Lilly Duncan

66. As a direct result of Defendants' conduct, Ms. Duncan has suffered:

Diagnosis of Post-Traumatic Stress Disorder (PTSD);

Ongoing nightmares and flashbacks;

Development of perfectionism and heightened anxiety;

Sexual exploitation by a staff member;

Medical neglect of her back condition;

Educational disruption and delayed academic progress;

Difficulty forming healthy relationships;

Loss of trust in therapeutic institutions;

Loss of critical developmental experiences during adolescence; and

Economic exploitation through unpaid forced labor.

### Olivia Clark

67. As a direct result of Defendants' conduct, Ms. Clark has suffered:

Diagnosis of Post-Traumatic Stress Disorder (PTSD);

Provision of alcohol while a minor;

Medical neglect when severely ill;

Psychological trauma from the punitive environment;

Educational disruption;

Loss of trust in therapeutic institutions;

Emotional distress from witnessing abuse of other residents; and

Economic exploitation through unpaid forced labor.

## V. CAUSES OF ACTION

### COUNT I

### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983

### (Against All Defendants)

68.    Plaintiffs incorporate by reference all preceding allegations.

69.    Defendants, acting under color of state law through their state licensure and regulation, deprived Plaintiffs of rights secured by the Constitution and laws of the United States.

70.    Defendants violated Plaintiffs' clearly established constitutional rights, including:

Fourteenth Amendment substantive due process rights to be free from abuse while in state custody;

Fourteenth Amendment liberty interests in personal security and bodily integrity;

Fourth Amendment rights to be free from unreasonable searches and seizures;

Eighth Amendment rights to be free from cruel and unusual punishment; and

Thirteenth Amendment rights to be free from involuntary servitude.

71.    Defendants acted with deliberate indifference to Plaintiffs' constitutional rights and safety.

72.    As a proximate result of Defendants' conduct, Plaintiffs suffered the damages alleged herein.

## COUNT II

## VIOLATION OF THE THIRTEENTH AMENDMENT –

## INVOLUNTARY SERVITUDE (42 U.S.C. § 1983)

### (Against All Defendants)

73.     Plaintiffs incorporate by reference all preceding allegations.

74.     The Thirteenth Amendment to the United States Constitution prohibits slavery and involuntary servitude.

75.     Defendants, acting under color of state law, subjected Plaintiffs to involuntary servitude by forcing them to perform unpaid labor for the economic benefit of the facility.

76.     The labor performed by Plaintiffs was not genuinely therapeutic or educational in nature, but rather served to reduce Defendants' operational costs and provide direct economic benefit to the facility.

77.     Plaintiffs were compelled to perform this labor through threats of punishment, isolation, and loss of privileges.

78.     Defendants' conduct violated Plaintiffs' clearly established Thirteenth Amendment rights.

## COUNT III

## VIOLATION OF THE FAIR LABOR STANDARDS ACT (29 U.S.C. § 201 et seq.)

### (Against All Defendants)

79.     Plaintiffs incorporate by reference all preceding allegations.

80.     The Fair Labor Standards Act (FLSA) requires payment of minimum wages to employees engaged in work that benefits their employer.

81.     Plaintiffs performed work that provided direct economic benefit to Defendants, including facility maintenance, food service, animal care, and general upkeep.

82. Plaintiffs were not paid any wages for this work, despite the work being of clear economic benefit to Defendants.

83. The work performed by Plaintiffs was not genuinely educational or therapeutic, but rather constituted regular operational labor that would otherwise require paid employees.

84. Defendants violated the FLSA by failing to compensate Plaintiffs for their labor.

85. Plaintiffs are entitled to back wages, liquidated damages, and attorney's fees under the FLSA.

## COUNT IV

### FORCED LABOR

### UNDER THE TRAFFICKING VICTIMS PROTECTION ACT (18 U.S.C. § 1589)

### (Against All Defendants)

86. Plaintiffs incorporate by reference all preceding allegations.

87. The Trafficking Victims Protection Act prohibits forced labor, defined as labor obtained through force, fraud, or coercion.

88. Defendants obtained labor from Plaintiffs through coercion, specifically through threats of punishment, isolation, and loss of privileges for non-compliance.

89. The labor obtained by Defendants provided them with commercial advantage and economic benefit.

90. Defendants' conduct constitutes forced labor in violation of 18 U.S.C. § 1589.

91. Plaintiffs are entitled to civil remedies under 18 U.S.C. § 1595.

## COUNT V

### TRAFFICKING WITH RESPECT TO FORCED LABOR (18 U.S.C. § 1590)

### (Against All Defendants)

92.     Plaintiffs incorporate by reference all preceding allegations.

93.     Defendants knowingly recruited, harbored, and maintained Plaintiffs for the purpose of subjecting them to forced labor.

94.     Defendants benefited financially from this forced labor arrangement.

95.     Defendants' conduct constitutes trafficking with respect to forced labor in violation of 18 U.S.C. § 1590.

## COUNT VI

### NEGLIGENCE

### (Against All Defendants)

96.     Plaintiffs incorporate by reference all preceding allegations.

97.     Defendants owed Plaintiffs a duty of care as minors entrusted to their custody for therapeutic treatment.

98.     This duty was heightened due to the residential nature of the program and the special vulnerability of the adolescents in Defendants' care.

99.     Defendants breached their duty of care through:

Failing to provide appropriate mental health treatment;

Failing to provide adequate medical care;

Failing to maintain a safe physical environment;

Failing to properly hire, train, and supervise staff;

Failing to protect Plaintiffs from sexual exploitation and abuse;

Failing to report suspected abuse as required by law;

Providing alcohol to a minor resident;

Subjecting residents to punitive isolation measures; and

Forcing residents to perform unpaid labor for facility benefit.

100.    Defendants' breaches were the proximate cause of Plaintiffs' injuries and damages.

## COUNT VII

### GROSS NEGLIGENCE

### (Against All Defendants)

101.    Plaintiffs incorporate by reference all preceding allegations.

102.    Defendants' conduct rose to the level of gross negligence, demonstrating wanton conduct done with conscious and reckless disregard for Plaintiffs' rights and safety.

103.    The pattern of abuse, failure to respond to reports of sexual exploitation, implementation of harmful interventions, provision of alcohol to minors, and systematic exploitation of child labor clearly meet the standard for gross negligence under North Carolina law.

## COUNT VIII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

104.    Plaintiffs incorporate by reference all preceding allegations.

105.    Defendants engaged in extreme and outrageous conduct that exceeded all bounds of decency and was utterly intolerable in a civilized community.

106.    Such conduct included subjecting minor residents to punitive isolation, sexual exploitation, provision of alcohol, forced labor, and systematic psychological abuse.

107.    Defendants intended to cause severe emotional distress or acted with reckless disregard of the probability of causing such distress.

108.    Plaintiffs suffered severe emotional distress as a direct result of Defendants' conduct.

## COUNT IX

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (In the alternative to Count VIII)

### (Against All Defendants)

109.    Plaintiffs incorporate by reference all preceding allegations.

110.    In the alternative, if Defendants' conduct is found not to have been intentional, Defendants' negligent conduct directly caused Plaintiffs to suffer severe emotional distress.

111.    The emotional distress suffered by Plaintiffs was foreseeable as a result of Defendants' conduct.

112.    Plaintiffs have suffered severe emotional distress, as evidenced by their PTSD diagnoses and ongoing psychological symptoms.

## COUNT X

## BREACH OF FIDUCIARY DUTY

### (Against All Defendants)

113.    Plaintiffs incorporate by reference all preceding allegations.

114.    As a residential facility for minors, Defendants stood *in loco parentis* to Plaintiffs and owed them fiduciary duties of care, loyalty, and protection.

115.    Defendants breached these fiduciary duties through their pattern of neglect, inappropriate interventions, failure to protect Plaintiffs from sexual exploitation, economic exploitation through forced labor, and prioritizing institutional financial interests over resident welfare.

## COUNT XI

## FRAUD AND NEGLIGENT MISREPRESENTATION

### (Against All Defendants)

116. Plaintiffs incorporate by reference all preceding allegations.

117. Defendants represented their facility as a therapeutic environment that would provide appropriate mental health treatment and care.

118. These representations were false, as Defendants operated a control-based environment that prioritized compliance and economic exploitation over therapy and employed unqualified staff.

119. Defendants knew these representations were false or made them with reckless disregard for their truth.

120. These misrepresentations induced Plaintiffs' parents to place them in Defendants' facility and continue paying for services that were not as represented.

121. Plaintiffs and their families reasonably relied on these misrepresentations to their detriment.

## COUNT XII

## FALSE IMPRISONMENT

### (Against All Defendants)

122. Plaintiffs incorporate by reference all preceding allegations.

123. The restrictions placed on Plaintiffs, particularly the extended "safety" interventions that exceeded Defendants' own stated policies, constitute false imprisonment under North Carolina law.

124. Plaintiffs were confined against their will through physical barriers and threats of punishment.

125. Such confinement was without legal justification and exceeded any reasonable bounds of therapeutic intervention.

## COUNT XIII

## NEGLIGENT HIRING, TRAINING, SUPERVISION, and RETENTION

### (Against All Defendants)

126.    Plaintiffs incorporate by reference all preceding allegations.

127.    Defendants failed to properly screen, hire, train, and supervise staff members working with vulnerable minor residents.

128.    Defendants knew or should have known of their employees' incompetence and unfitness for their positions.

129.    Defendants failed to remove employees that Defendants knew or should have known were unfit for their position.

130.    This negligent hiring, training, supervision, and retention directly resulted in harm to Plaintiffs, including sexual exploitation, provision of alcohol to a minor, and inappropriate sexual comments.

## COUNT XIV

## UNFAIR AND DECEPTIVE TRADE PRACTICES (N.C.G.S. § 75-1.1)

### (Against All Defendants)

131.    Plaintiffs incorporate by reference all preceding allegations.

132.    Defendants' misrepresentations about the nature of their program and services provided constitute unfair and deceptive trade practices under North Carolina law.

133.    The failure to disclose the true nature of the program, inadequate staffing, punitive rather than therapeutic approach, unqualified staff, and forced labor requirements all constitute material misrepresentations affecting commerce.

134.    These practices caused injury to Plaintiffs and their families who paid substantial sums for services that were not as represented.

## COUNT XV

### NEGLIGENCE *PER SE* FOR STATUTORY VIOLATIONS

**(Against All Defendants)**

135.    Plaintiffs incorporate by reference all preceding allegations.

136.    Defendants violated numerous North Carolina and federal statutes and regulations, including:

    N.C.G.S. § 7B-301 (mandatory reporting of suspected child abuse);

    N.C.G.S. § 14-318.2 and § 14-318.4 (child abuse statutes);

    Fair Labor Standards Act (29 U.S.C. § 201 et seq.); and

    Various licensing regulations for residential care facilities.

137.    These violations constitute negligence *per se* under North Carolina law.

138.    Plaintiffs are within the class of persons these statutes were designed to protect.

139.    The harm suffered by Plaintiffs is of the type these statutes were designed to prevent.

## COUNT XVI

### CIVIL CONSPIRACY

**(Against All Defendants)**

140.    Plaintiffs incorporate by reference all preceding allegations.

141.    Defendants entered into a conspiracy to implement harmful policies, cover up reports of abuse, exploit child labor, and repeatedly rebrand to avoid accountability.

142.    There was an agreement between the corporate defendants to engage in this course of conduct.

143. Overt acts were taken in furtherance of the conspiracy, including the systematic cover-up of the sexual exploitation report, the confiscation of resident handbooks during rebranding, and the implementation of forced labor policies.

144. Plaintiffs were damaged as a proximate result of this conspiracy.

## **COUNT XVII**

### **BATTERY**

### **(Against All Defendants)**

145. Plaintiffs incorporate by reference all preceding allegations.

146. Defendants, through their agents and employees, committed battery against Plaintiffs by intentionally causing harmful or offensive contact.

147. Such contact included inappropriate touching, physical restraints beyond therapeutic necessity, and other unwanted physical contact.

148. Plaintiffs did not consent to such contact, and any apparent consent was invalid due to their status as minors in an institutional setting.

## **COUNT XVIII**

### **ASSAULT**

### **(Against All Defendants)**

149. Plaintiffs incorporate by reference all preceding allegations.

150. Defendants, through their agents and employees, committed assault against Plaintiffs by intentionally causing reasonable apprehension of imminent harmful or offensive contact.

151. The threatening environment, physical restraints, and isolation measures created reasonable apprehension of harmful contact in Plaintiffs' minds.

## COUNT XIX

## VIOLATION OF NORTH CAROLINA PATIENTS' RIGHTS

### (Against All Defendants)

152.    Plaintiffs incorporate by reference all preceding allegations.

153.    As patients receiving treatment at a healthcare facility, Plaintiffs had statutory and common law rights to appropriate care, informed consent, and freedom from abuse.

154.    Defendants violated these patient rights through their pattern of abuse, neglect, forced labor, and failure to provide appropriate therapeutic care.

## VI. DAMAGES

155.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and continue to suffer substantial damages, including but not limited to:

A.  Past and Future Medical Expenses for treatment of physical and psychological injuries sustained as a result of their time at Defendants' facility;

B.  Physical Pain and Suffering from untreated medical conditions and physical abuse;

C.  Severe Emotional Distress and Mental Anguish, as evidenced by PTSD diagnoses and ongoing psychological symptoms;

D.  Lost Wages and Economic Exploitation from unpaid forced labor performed for Defendants' benefit;

E.  Loss of Educational Opportunities and developmental experiences;

F.  Loss of Enjoyment of Life and normal adolescent experiences;

G.  Loss of Trust in therapeutic and healthcare institutions;

H.  Future Therapy and Counseling Costs to address trauma inflicted by Defendants;

I.  Lost Future Earning Capacity due to educational disruption and psychological harm;

J.   Liquidated Damages under the Fair Labor Standards Act;

K.   Other Economic and Non-Economic Damages to be proven at trial.

156.   The egregious nature of Defendants' conduct, particularly the sexual exploitation of a minor, provision of alcohol to a minor, forced labor of minors, and systematic cover-up of abuse reports, supports an award of punitive damages under N.C.G.S. § 1D-15, as Defendants' conduct demonstrated willful and wanton disregard for Plaintiffs' rights and safety.

## VII. JURY DEMAND

157.   Plaintiffs hereby demand a trial by jury on all issues so triable as a matter of right.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.   Enter judgment in favor of Plaintiffs and against Defendants on all counts;

B.   Award Plaintiffs compensatory damages in an amount to be determined at trial;

C.   Award Plaintiffs punitive damages in an amount to be determined at trial;

D.   Award Plaintiffs back wages and liquidated damages under the Fair Labor Standards Act;

E.   Award Plaintiffs damages under the Trafficking Victims Protection Act;

F.   Award Plaintiffs reasonable attorneys' fees and costs as provided by law, including under the FLSA and TVPA;

G.   Award Plaintiffs pre- and post-judgment interest at the maximum rate allowed by law;

H.   Grant such other and further relief as this Court deems just and proper.

Dated: August 20, 2025

RESPECTFULLY SUBMITTED,

/s/ *Joel R. Rhine*

RHINE LAW FIRM, P.C.
Joel R. Rhine, NCSB 16028
Email: jrr@rhinelawfirm.com
Ruth A. Sheehan, NCSB 48069
Email: ras@rhinelawfirm.com
1612 Military Cutoff Road, Suite 300
Wilmington, NC 28403
Tel: (910) 772-9960
Fax: (910) 772-9062

and

Gareth S. Purnell (*Pro Hac Vice* application
forthcoming)
Simon B. Purnell (*Pro Hac Vice* application
forthcoming)
**GRIFFIN PURNELL LLC**
2037 Airline Road, Suite 200
Corpus Christi, Texas 78412
(361) 262-1776
(361) 356-4348 Fax
gareth@griffinpurnell.com
simon@griffinpurnell.com
Service email: support@griffinpurnell.com

**ATTORNEYS FOR PLAINTIFFS**