IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| LILLY GRACE DUNCAN and OLIVIA CLARK | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | CIVIL NO. 1:25-cv-00277-MR-WCM |
| ASHEVILLE ACADEMY FOR GIRLS, LLC (f/k/a SOLSTICE EAST, LLC and MAGNOLIA MILLS SCHOOL), WILDERNESS TRAINING & CONSULTING, LLC (d/b/a FAMILY HELP & WELLNESS, and JOHN DOE ENTITIES 1-10 | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| and | ) ) | |
| ASHEVILLE ACADEMY FOR GIRLS, LLC (F/K/A SOLSTICE EAST, LLC AND MAGNOLIA MILLS SCHOOL), | ) ) ) ) ) | |
| Third-Party Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| WILLIAM CLARK, KRISTINA CLARK, CLAUDIA DUNCAN, AND HARLEY BROOKE DUNCAN, | ) ) ) ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF THIRD-PARTY DEFENDANTS WILLIAM CLARK, KRISTINA CLARK, CLAUDIA DUNCAN, AND HARLEY BROOKE DUNCAN'S MOTION TO DISMISS THIRD-PARTY COMPLAINT

Third-Party Plaintiff Asheville Academy for Girls, LLC's ("AAG") Third-Party Complaint

represents a reprehensible attempt to force the parents of two abused girls to pay for AAG's own

sexual abuse, physical abuse, forced labor, provision of alcohol to minors, punitive isolation, and systematic cover-up of that misconduct. The Parents paid AAG substantial tuition—tens of thousands of dollars—relying on AAG's representations that it was a safe, therapeutic residential treatment program with expertise in adolescent girls' mental health. Instead, AAG subjected Lilly Grace Duncan and Olivia Clark to a regime of exploitation, sexual assault, physical and emotional abuse, and forced labor that provided economic benefit to the facility while destroying the girls' mental health.

1.　　AAG now seeks to weaponize the trust these desperate parents placed in it by demanding that the Parents pay AAG's defense costs and indemnify any judgment the girls obtain. AAG's claims fail as a matter of law on multiple independent grounds:

(1)　　the indemnification provisions are unenforceable as against public policy because they purport to shield AAG from liability for intentional torts, gross negligence, breach of fiduciary duty, and violations of child-protection statutes;

(2)　　the provisions are procedurally and substantively unconscionable contracts of adhesion;

(3)　　common-law indemnity is unavailable because AAG's liability (if any) is direct and primary, not secondary or derivative; and

(4)　　contribution is unavailable because AAG has denied liability in its Answer, because the Parents share no fault, and because North Carolina does not allow contribution for intentional torts or breach of fiduciary duty.

2.　　Each ground independently requires dismissal of the Third-Party Complaint with prejudice. Additionally, the Parents assert counterclaims against AAG for fraud, negligent

misrepresentation, breach of contract, violation of North Carolina's Unfair and Deceptive Trade Practices Act, and declaratory relief.

## I.    <u>FACTUAL BACKGROUND</u>

3.      Plaintiffs Lilly Grace Duncan and Olivia Clark were vulnerable minors when their parents enrolled them at AAG (operating at various times as Solstice East, Magnolia Mills School, and Asheville Academy for Girls). The facility was owned and controlled by Wilderness Training & Consulting, LLC d/b/a Family Help & Wellness ("FHW"), a for-profit entity that marketed AAG as providing expert care for adolescent behavioral health.

4.      The Parents, desperate for help, relied entirely on those representations. They paid substantial tuition and entrusted AAG with near-total control over their minor children. Instead of receiving therapeutic care, AAG subjected the girls to sexual assault, physical abuse, forced labor for the facility's economic benefit, provision of alcohol to minors, punitive isolation, employment of unqualified and predatory staff, and systematic cover-up of abuse reports.

5.      AAG now asserts that the enrollment agreements signed by the Parents require the Parents to indemnify AAG for its own intentional and grossly negligent misconduct. The quoted language is extraordinarily broad: the Parents must indemnify AAG for "any and all actions, causes of action, claims, demands, costs (including attorneys' fees), expenses, liabilities and charges, known or unknown arising out of or in connection with claims and/or actions relating to or brought by or on behalf of the student." (Third-Party Complaint ¶¶ 11, 14). All of AAG's claims rest on this language or on common-law theories that require joint fault.

## II.    <u>LEGAL STANDARD</u>

6.      A complaint must be dismissed if it fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). A Rule 12(b)(6) motion tests the legal sufficiency of the

Complaint. *See Papasan v. Allain*, 478 U.S. 265, 283 (1986). A Complaint must allege enough facts to state a claim for relief that is facially plausible. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Facial plausibility means that the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and mere recitals of the elements of a cause of action supported by conclusory statements do not suffice. *Id.* The well-pled factual allegations must move a claim from conceivable to plausible. *See Twombly*, 550 U.S. at 570. If it appears that a plaintiff is not entitled to relief under the stated facts, dismissal is proper. *See Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991).

## III.  ARGUMENT

### A.  The Contractual Indemnification Claims Should Be Dismissed Because the Indemnification Provisions Are Unconscionable

7.      AAG's claims for contractual indemnity should be dismissed because the indemnification provisions are unconscionable. The indemnification provisions were a required "heads-I-win-tails-you-lose" contract in which the trusting Parents gave up everything to the private-equity funded AAG—and got nothing in return. The indemnification provisions are accordingly an overbroad adhesive contract that is both substantively and procedurally unconscionable.

8.      Procedural unconscionability is found where there is "bargaining naughtiness in the form of unfair surprise, lack of meaningful choice, and an inequality of bargaining power" *Tillman v. Commercial Credit Loans, Inc.*, 362 N.C. 93, 102 (2008) (quoting *Rite Color Chemical Co. v. Velvet Textile Co.*, 105 N.C. App. 14, 20 (1992)). On the other hand, substantive unconscionability

will be found when there are "harsh, one-sided, and oppressive contract terms." *See Tillman*, 362 N.C. at 103.

9.     In determining whether the indemnification provisions are unconscionable, the Court's "substantive/procedural analysis is more of a sliding scale than a true dichotomy." *Id.* at 103. In other words, "[t]he harsher the clause, the less 'bargaining naughtiness' that is required to establish unconscionability." *Id.* The ultimate question that is affirmatively answered here is whether the "terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." *Id.*

10.     To allow AAG to enforce the harsh indemnification provisions would force the Parents, and any other unsuspecting parent who signed a similar agreement with AAG and files a case in this jurisdiction, to pay the legal costs of their child's abuser. This would be profound and shocking, such that "no decent, fair-minded person would view the ensuing result without being possessed of a profound sense of injustice…" *Blaylock Grading Co., LLP v. Smith*, 189 N.C. App. 508, 511 (2008) (quoting *Gas House, Inc. v. Southern Bell Tel. & Tel. Co.*, 289 N.C. 175, 182 (1976)). The Court should dismiss AAG's claims for contractual indemnity with prejudice.

### 1.     The Indemnification Provisions Are Substantively Unconscionable Because They Are Harsh, One-Sided, and Violate North Carolina Public Policy

11.     The indemnification provisions are substantively unconscionable for at least four reasons. First, they are harshly one-sided with unlimited scope. Second, they operate as an illegal waiver of both the girls' rights and AAG's duties, violating North Carolina public policy. Third, they weaponize family relationships by forcing victims to choose between justice and family ruin—directly contradicting AAG's therapeutic promises. And fourth, they improperly shift federal statutory remedies from a corporate tortfeasor to individual parents of the victim. Together, these factors demonstrate extreme substantive unfairness.

### a. The Provisions Are Completely One-Sided with Unlimited Scope

12.     With the indemnification provisions, the Parents gave up all rights, assumed unlimited financial liability, and received nothing in return. The lopsided waiver provision required the Parents to preemptively release AAG, and everyone imaginable who could be affiliated with AAG—including peripheral entities like "insurers," "attorneys," "community organizations" and even "related or affiliated business entities…"—none of whom are signatories to the agreement, or even named in it. (*See* C 10 Third-Party Complaint ¶¶ 11, 14).

13.     As to the laundry list of released parties, the enrollment agreements use expansive language to include all possible claims. They purport to require the Parents to "release, in advance, and to waive…any and all claims for damages for death, personal injury…" that arise "through negligence, carelessness or any other cause…" (*See* ECF No. 10 Third-Party Complaint ¶¶ 11, 14). They specifically contract away AAG's "breach of any duty owed to" the Parents or the girls— minors in AAG's custody. *Id.* There is no limitation whatsoever on who or what is being released. Any entity, i.e., "related or affiliated business entity," with even a tangential connection to AAG could claim protection under this provision, despite never being identified to the Parents. *Id.*

14.     The language of the indemnification provisions is even more expansive and attempts to cover any conceivable liabilities AAG might incur because of the girls, to include all of their claims and claims brought by other parties that "relate to" their time at AAG, to include: "actions, causes of action, claims, demands, damages, costs (including attorneys' fees), expenses, liabilities and charges, known or unknown…arising out of or in connection with claims and/or actions relating to or brought by or on behalf of Student, including, without limitation, claims related to or arising out of the Student's participation in the Program." (*See* ECF No. 10 Third-Party Complaint ¶¶ 11, 14) (emphasis added).

15. The breadth is staggering. There is no limitation to the Parents' financial exposure and no limitation to what they released. Under this language, if another student injured the girls, and they sued AAG for failing to protect them, the Parents would have to pay. If a staff member drove drunk and got in an accident with the girls in the car, the Parents would have to pay. If the girls had died in the restraints AAG put them in, the Parents would have to pay.

16. The Parents would also pay for indirect claims, such as the girls being purported members of a class action against AAG, or if the State fined AAG for violations uncovered during the girls' stay. The effect, evidenced by AAG's Third-Party Complaint, is that AAG does what it wants, without liability, and the Parents, or other unsuspecting parents, pay everything.

17. Indeed, the Parents already paid substantial tuition while the girls were at AAG. The girls did not receive what AAG promised. Rather, the Parents bought abuse for their daughters and unlimited financial liability for themselves. There was no consideration in return for this extreme financial exposure and preemptive release of all rights. No reasonable facility that was sincerely interested in healing families would insist on such an abusive clause in a boilerplate contract.

**b. The Provisions Violate Multiple Public Policies**

18. Beyond their unconscionable scope, the indemnification provisions violate multiple aspects of North Carolina public policy. First, the Parents could not waive the girls' claims because they were minors when the Parents signed the agreements. *See Creech v. Melnik*, 147 N.C. App. 471, 478 (2001) (finding that it was "well established in North Carolina that a covenant not to sue negotiated for a minor is invalid without investigation and approval by the trial court."). The girls' claims against AAG are therefore valid, despite any purported waiver of them in the enrollment agreements.

19.     Second, AAG cannot contract away its own negligence because to do so would violate North Carolina public policy. *See Alston v. Monk*, 92 N.C. App. 59, 64, 373 S.E.2d 463, 466 (1988), disc. review denied, 324 N.C. 246, 378 S.E.2d 420 (1989). Providing residential mental health services to children is "extensively regulated to protect the public from danger," and "it would violate public policy to allow those engaged in such an activity to absolve themselves from the duty to use reasonable care." *See McMurray v. United States*, 551 Fed. Appx. 651, 655 (4th Cir. 2014) (quoting *Forston v. McClellan*, 131 N.C. App. 635, 637 (1998)). AAG cannot absolve itself from its duty of reasonable care, yet that is precisely what it attempts here through forcing the Parents to indemnify its negligence. *See McMurray*, 551 Fed. Appx. at 653 (quoting *Hall v. Sinclair Refining Co.*, 242 N.C. 707, 89 S.E.2d 396, 398 (1955)) (noting exculpatory contracts are unenforceable when "violative of some rule of public policy" or where parties have "unequal bargaining power").

20.     Third, AAG cannot contract away liability for intentional acts. North Carolina prohibits waiver and indemnification for intentional conduct. *See, e.g.*, *Ada Liss Group v. Sara Lee Corp.*, 2010 U.S. Dist. LEXIS 59691, 28 (M.D.N.C. 2010) ("The precedent created if contracts with exculpatory clauses for intentional torts became enforceable would be noxious."); *See Graham v. James F. Jackson Associates, Inc.*, 84 N.C. App. 427, 432 (1987) ("It is a general rule that an insurance policy is void as against public policy if its intent is to indemnify the insured against liability for his own criminal acts."). The underlying Complaint alleges several intentional acts that AAG cannot push onto the Parents.

21.     Finally, the indemnification provisions discourage abuse reporting. North Carolina requires all adults to report suspected child abuse, with criminal penalties for failure to report. N.C. Gen. Stat. § 7B-301. Yet under the indemnification provisions, if anyone—the Parents, the girls,

even an AAG employee—reported the girls' abuse to the authorities, AAG could force the Parents to pay all resulting costs and fines as "relating to" the girls. (*See* ECF No. 10 Third-Party Complaint ¶¶ 11, 14). This perverse incentive protects abusers while punishing victims and their families, directly contradicting North Carolina's expansive reporting policy.

### c. AAG Is Weaponizing the Family Relationship It Promised to Restore

22.    The indemnification provisions also weaponize family relationships by forcing victims, like the girls, who were minors when they enrolled at AAG, to later choose between justice and family financial ruin. This directly contradicts AAG's extensive marketing promises of family healing.

23.    AAG's marketing and representations to the Parents are important considerations because "[i]n determining whether a contract is unconscionable, a court must consider all the facts and circumstances of a particular case." *See Brenner v. Little Red School House, Ltd.*, 302 N.C. 207, 213 (1987). Here, AAG and its corporate parent marketed themselves as providing services designed to help families and achieve meaningful family change. Based on these representations, the Parents decided to enroll the girls at AAG.

24.    The cynical duplicity of AAG's scheme is exposed within the very contracts the Parents signed. AAG required the Parents to "maximize the benefits of the Program" through cooperating with AAG, reading AAG's materials, and attending AAG's seminars. Yet the indemnification provisions transform this mandated family cooperation into a weapon that tears families apart.

25.    The girls must now endure more trauma and choose between obtaining justice and destroying their parents financially. This is an impossible choice that no genuinely therapeutic facility should ever impose on a client. *See Estates of Morgan v. Fairfield Family Counseling*

*Center*, 77 Ohio St.3d 294, 290 (1997) (recognizing special vulnerability of patients in therapeutic relationships and heightened duties owed). AAG cannot have it both ways. It cannot brand itself as an expert in family healing, promise the Parents that same level of family healing, mandate their cooperation and attendance as essential to treatment, then force them to bear the cost of AAG's abuse of the girls.

26.     This itself is abusive trauma, and it epitomizes substantive unconscionability because no reasonable person would ever knowingly agree to it, and no honest facility would ever require it.

**d. The Indemnification Provisions Unlawfully Shift Statutory Remedies**

27.     The indemnification provisions attempt to accomplish what federal law discourages: shifting liability for trafficking violations from the perpetrator to the victim's family. The underlying Complaint alleges AAG violated the TVPRA by forcing the girls to perform unpaid labor. The TVPRA provides trafficking survivors with a federal civil remedy against only the perpetrator of their abuse and/or whoever knowingly benefits from their exploitation. 18 U.S.C. § 1595(a).

28.     This Circuit has not examined whether a mental health facility that used forced labor to punish minors can shift its TVPRA liability onto the children's parents. While there are cases in other jurisdictions that have allowed contractual indemnity claims to proceed as between corporate defendants facing TVPRA claims, such as a hotel franchisee and franchisor, those cases involved allegations of the indemnitors benefiting from the trafficking. *See, e.g.*, *C.D. v. Red Roof Inns, Inc.*, 2024 U.S. Dist. LEXIS 237690, at *16-17 (N.D. Ga. 2024) (quoting *A.B. v. Marriott Int'l, Inc.*, 2020 U.S. Dist. LEXIS 117728, at *5 (E.D. Pa. 2020)) (allowing hotel chain to file indemnity claim against franchisee because franchisee may have benefited from the

trafficking); *see also Doe v. Red Roof Inns*, 21 F.4th 714, 723 (11th Cir. 2021) (discussing remedial purpose of TVPRA civil remedy). AAG does not allege the Parents benefited from the girls' forced labor at AAG. To the contrary, the Parents paid AAG substantial sums for services AAG failed to provide, while AAG extracted free labor from their daughters that should have been performed by paid staff.

29.     In a similar context, this Court has already held that a corporation cannot use indemnification agreements to push its liability under a federal remedial statute onto an individual. In *Lowe's Cos. v. Varnell, Struck & Assocs.*, this Court recognized that forcing employees to indemnify FLSA violations would "gut the remedial nature of the FLSA." 2008 U.S. Dist. LEXIS 108144, *25-26 (W.D.N.C. 2008) (noting that "[c]ourts have consistently held that indemnification violates public policy where the employee or employee funds are the sources of indemnification."). AAG seeks to do nearly that by funding its TVPRA liability to the girls through the Parents.

30.     The TVPRA context makes indemnification here even more offensive than in employment cases. There, an adult who has some bargaining power during their employment process and does not have to sign the agreement, still cannot indemnify the corporate employer's wage violations. Here, the girls were minors when the Parents signed their enrollment paperwork. They had no bargaining power or voice in the transaction, yet they are being forced to push AAG's TVPRA liability onto the Parents.

31.     The resulting economic absurdity is stark. The Parents paid substantial tuition for the girls to attend AAG. Rather than help the girls, AAG forced them to perform unpaid labor that should have been done by paid staff. Now AAG wants the Parents to pay again. This is triple extortion: payment for services not provided, extraction of free labor from their daughters, then indemnification for that exploitation. Enforcing the indemnification provisions would not just "gut

the remedial nature" of the TVPRA, it would transform a statute designed to help survivors into one that bankrupts their families. *See Lowe's Cos.*, 2008 U.S. Dist. LEXIS 108144, *25-26.

### 2. The Indemnification Provisions Are Procedurally Unconscionable

32.     The indemnification provisions are also procedurally unconscionable. Like the *Tillman* corporate defendant's mandatory agreement, AAG required the enrollment agreements "as a condition of Plaintiff's enrollment." (Third-Party Complaint ¶¶ 10, 13). This admission establishes the enrollment agreements as adhesion contracts that AAG presented on a take-it-or-leave-it basis.

33.     The disparity in bargaining power was extreme. AAG is part of a private-equity-backed corporate conglomerate that oversees multiple other facilities. The Parents relied wholly on AAG and the other Defendants' representations about AAG's services and their ability to help the girls. Like the "unsophisticated consumers contracting with corporate defendants" in *Tillman*, the Parents were faced with the same type of adhesive boilerplate agreement. 362 N.C. at 103.

34.     The Parents had no meaningful choice. Based on AAG's representations, the Parents believed AAG was uniquely qualified to help the girls. They faced the binary decision of signing the enrollment agreements or denying the girls access to what they believed was their best option.

35.     Moreover, the indemnification provisions constitute unfair surprise. Nothing in AAG's extensive marketing would alert reasonable parents that buried in the enrollment paperwork was a provision requiring them to pay all costs for their daughters' abuse, and any conceivable claims related to it. Rather, AAG and Family Help & Wellness promised to provide services designed to help families. Abusing a child and then forcing her parents to pay the settlement, costs, and attorneys' fees is a far cry from helping families.

36. Under *Tillman*'s "sliding scale" even minimal procedural unfairness can render a contract with extremely harsh terms unconscionable. *See Tillman* 362 N.C. at 103 (2008) (finding unconscionability appropriate when contracts present "pronounced substantive unfairness and a minimal degree of procedural unfairness.") Here, the procedural unfairness is far from minimal. There was a vast bargaining disparity, a required adhesion contract, and complete unfair surprise. Combined with the extreme substantive unconscionability demonstrated above, the provisions are unenforceable as a matter of law. The Court should dismiss AAG's Contractual Indemnity claims with prejudice.

**B.    The Common Law Indemnity Claims Fail as a Matter of Law**

37. AAG's causes of action for common law indemnification must be dismissed because they fail to plausibly establish either of the required elements for the claims. In North Carolina, common law indemnification requires both that AAG and the Parents share joint and several liability to the girls and either that AAG was passively negligent or that its liability is derivative to that of the Parents. *See Kaleel Builders, Inc. v. Ashby*, 161 N.C. App. 34, 41 (2003) (citing *Edwards v. Hamill*, 262 N.C. 528, 138 (1964)). AAG does not satisfy either element, and no amendment could cure this fundamental defect.

38. AAG's Third-Party Complaint rests on three conclusory and insufficient allegations: (1) the Parents' decision to enroll the girls at AAG was somehow negligent; (2) the Parents failed to disclose unspecified "relevant information at the time of enrollment"; and (3) the Parents failed to "appropriately supervise, direct, or inform" the girls regarding AAG. (*See* ECF No. 10 Third-Party Complaint ¶¶ 29, 33). Every one of AAG's allegations was temporally severed the moment the girls entered AAG and AAG assumed custody of them.

39.     To be sure, the Parents dispute all three allegations. They relied wholly on the representations of AAG and the Defendants in deciding to enroll the girls at AAG. AAG, not the Parents, held itself out as the "expert" in teen mental health, and conducted an intake and in-person interview of the girls, and the Parents, before their enrollment. Whatever unspecified information the Parents allegedly failed to disclose during AAG's extensive intake process could in no way supersede AAG's subsequent and systemic abuse of the girls. Finally, the third allegation is repetitive of the first—whatever representations the Parents made to the girls were fully informed by what they received from AAG.

40.     The reality here is as simple as it is tragic. AAG misrepresented its services to the Parents. The Parents relied on those misrepresentations and allowed AAG to take exclusive custody of the girls for the express purpose of helping them. AAG then abused the girls for months while limiting their contact with the Parents. No plausible legal theory could transform these facts into parental liability.

41.     Even accepting AAG's allegations as true, none of them, either alone or combined, establishes both requirements for common law indemnification for three reasons. First, the Parents and AAG are not jointly and severally liable to the girls. Second, AAG was actively negligent. And third, AAG's liability is not derivative to the Parents' alleged liability. The Court should dismiss these causes of action with prejudice.

**1. The Parents and AAG Are Not Jointly and Severally Liable to the Girls**

42.     The Parents and AAG are not jointly and severally liable to the girls. Joint and several liability is allowed only when defendants create "a single indivisible injury." *See Warren v. Colombo*, 93 N.C. App. 92, 104-105 (1989). An indivisible injury occurs when "(1) defendants have acted in concert to commit a wrong that caused an injury; or (2) defendants, even without

acting in concert, have committed separate wrongs that still produced an indivisible injury." *See GE Betz, Inc. v. Conrad*, 231 N.C. App. 214, 235 (2013). For there to be an indivisible injury, apportionment must be impossible, meaning the harms are not distinct. *See Warren*, 93 N.C. App. at 104-105. Neither scenario exists here, and the Parents' alleged harm is entirely distinct from AAG's.

43. The Parents did not act in concert with AAG to harm their daughters. Indeed, the Parents transferred custody to AAG upon admission. All of the Parents' alleged harm accordingly occurred before the girls' admission to AAG. (*See* ECF No. 10 Third-Party Complaint ¶¶ 29, 33). And AAG's abuse and neglect of the girls occurred after their admission to AAG. The Parents did not tell the girls that AAG would abuse and neglect them, and they could never have known because AAG told the Parents the complete opposite.

44. A simple comparison of the allegations shows that separate acts did not combine to produce an indivisible injury. The girls' injuries stem from AAG's assault, abuse, forced labor, ~~and~~ institutional neglect, coercion, and humiliation. This was all pattern and practice for AAG, and AAG never warned the Parents. AAG alleges the Parents were somehow negligent in their enrollment of the girls. These are not indivisible harms. *See Seigneur v. National Fitness Institute, Inc.*, 132 Md. App. 271, 312 (2000) (holding parent's decision to enroll child in program and facility's subsequent abuse were divisible harms capable of apportionment); *see J.A.W. v. Roberts*, 627 N.E.2d 802, 807 (Ind. Ct. App. 1994) (parental decisions regarding placement distinct from facility's subsequent abuse).

45. Taking AAG's accusations as true, enrollment decisions and systematic institutional abuse are entirely distinct harms capable of clear apportionment. They are temporally severed and factually distinct. AAG cannot establish the indivisible injury required for joint and several

liability. Moreover, even if the Parents' enrollment decision could somehow constitute negligence, AAG's systemic abuse of the girls represents an independent intervening cause that would sever any causal connection to the Parents' decision. *See Holtzman v. Roberson*, 357 N.C. 242, 248 (2003) (discussing superseding cause doctrine). These claims should be dismissed.

**2. AAG Was Actively Negligent and Its Liability Is Not Derivative to the Parents'**

46.     In addition to establishing joint and several liability, which it cannot do, AAG must plausibly allege that either (1) the Parents were actively negligent or (2) that the Parents alone committed the harm and that AAG's liability is therefore derivative to the Parents'. *See Kaleel Builders, Inc.* 161 N.C. App. at 41 (citing *Edwards*, 262 N.C. at 138). Neither applies here.

47.     AAG was actively negligent. AAG directly and exclusively committed every act that injured the girls. According to the underlying Complaint, AAG's employees sexually exploited the girls, subjected them to physical abuse and restraints, actively controlled every aspect of their daily lives, subjected them to punitive isolation and other harmful interventions, restricted their food and contact with parents, and forced them into unpaid labor for the facility's benefit. Against this litany of abuse, AAG contends it was passively negligent and that the Parents' alleged enrollment decisions and disclosures were the active side of the coin. (*See* ECF No. 10 Third-Party Complaint ¶¶ 29, 33). The Parents are nowhere to be found in this months-long horror of active and nightmarish abuse and neglect. No plausible amendment transforms the Parents' enrollment decisions into "active" negligence while recasting AAG's months of hands-on abuse and neglect as merely "passive."

48.     AAG's liability is also not derivative to the Parents'. This alternative prong permits indemnification only where "one alone has done the act which produced the injury but the other is derivatively liable for the negligence of the former." *See Edwards*, 262 N.C. at 531. Indeed, "[t]he

party seeking indemnity must have imputed or derivative liability for the tortious conduct from which indemnity is sought." *See Kaleel Builders, Inc.*, 161 N.C. App. at 41. There is no reading of the live complaints in this action that could suggest the Parents alone harmed the girls.

49. The relationship between the Parents and AAG is not one of derivative liability, which commonly arises through a legal relationship, such as agent/principal, in which the principal does nothing but remains liable for acts done solely by its agents. *See, e.g.*, *Yates v. New South Pizza, Ltd.*, 330 N.C. 790 (1992). AAG and the Parents were not agents.

50. The Parents transferred custody to AAG upon admission. From that moment forward, AAG exercised exclusive control over the girls and acted independently of the Parents. No agency or derivative liability relationship existed. *See Reardon v. Wrightwood Manor*, 136 Cal.App.3d 1006, 1009 (1982) (facility's duty independent of family's placement decision); *see Cowan v. Doering*, 111 N.J. 451, 462-63 (1988) (institutional liability not derivative of parental decisions.)

51. The legal impossibility of AAG's pleading becomes clear when considering what facts could plausibly support derivative liability. AAG would need to allege it is being held liable solely for the Parents' acts, not its own conduct. This would require alleging the Parents' enrollment decisions and intake paperwork, alone—not AAG's sexual exploitation, forced labor, or physical and mental abuse—caused the girls' injuries. The Parents did not knowingly enroll the girls at AAG for abuse and neglect. No plausible legal theory recasts their enrollment decision as active negligence in the face of AAG's conduct. AAG's months of neglect and abuse create direct liability.

52. AAG cannot satisfy any element required for common law indemnity. Because no conceivable amendment could cure these fundamental defects, the Court should dismiss these causes of action with prejudice.

**C.** **The Contribution Claims Must Be Dismissed Because They Fail Under Several Statutory Restrictions**

53.     AAG's contribution claims are statutorily prohibited. The Uniform Contribution Among Tort-Feasors Act ("UCATFA") governs contribution claims in North Carolina. *See* N.C. Gen. Stat. § 1B-1. The UCATFA enumerates several exceptions that limit the general right to contribution, three of which apply here to foreclose AAG's claims. *Id.* First, by AAG's own admission, AAG and the Parents are not joint tortfeasors as required for contribution. *Id.* at (a). Second, AAG cannot seek contribution because it breached its fiduciary duty to the girls. *Id.* at (g). And third, AAG's intentional acts against the girls preclude its right to contribution from the Parents. *Id.* at (c). Any one of these would independently warrant dismissal of AAG's contribution claims. Because all three are evident here, the Court should dismiss the claims with prejudice as no amendment could overcome all three statutory obstacles.

### 1. The Parents Are Not Joint Tortfeasors with AAG

54.     AAG denies it was negligent. (*See* ECF No. 9 Answer at 12, Fourth Affirmative Defense) ("If it is determined that these answering Defendants were negligent, as alleged in Plaintiffs' Complaint or otherwise, which has been and is once again expressly denied…") (emphasis added). AAG's contribution claims must be dismissed with prejudice because it denies that it was a joint tortfeasor with the Parents. This denial alone is fatal to the contribution claims.

55.     Moreover, AAG simply cannot meet its burden to allege circumstances tending to show liability to the injured party [the girls] as well as a right to contribution." *See Holland v. Edgerton*, 324 N.C. 467, 470 (1989). As noted above in section III.B.1., the Parents did not act in concert with AAG. The Parents relied on AAG's representations of expertise in deciding to enroll the girls, then entrusted them exclusively to AAG for months. AAG abused the girls from day one and continued to do so for months without the Parents' involvement.

56. Nor did any separate acts unite to create an indivisible injury. The Parents' alleged harm is temporally limited to the intake process at AAG, that AAG controlled. Further, intake decisions are easily divisible from AAG later institutional abuse of the girls. These harms are temporally severed, factually distinct, and entirely apportionable.

57. There is no basis for contribution. AAG denies it was negligent, and there is no indivisible injury. AAG's contribution claims must be dismissed pursuant to N.C. Gen. Stat. § 1B-1(a).

## 2. AAG Cannot Seek Contribution Because It Breached Its Fiduciary Duty to the Girls

58. AAG cannot seek contribution from the Parents because it breached its fiduciary duty to the girls. N.C. Gen. Stat. § 1B-1 (g) (Contribution "shall not apply to breaches of trust or of other fiduciary obligation.") AAG had a confidential relationship with the girls and therefore owed them a fiduciary duty. AAG repeatedly breached that duty, as described herein, by abusing, neglecting, and labor trafficking the girls.

59. While North Carolina courts have been reluctant to define the term "fiduciary relation," one can be found "wherever confidence on one side results in superiority and influence on the other side; where a special confidence is reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *See King v. Bryant*, 369 N.C. 451, 464 (2017) (quoting *Vail v. Vail*, 233 N.C. 109, 114 (1951)). Ultimately, "[i]t is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other." *See King*, 369 N.C. 464 (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598 (1931)).

60.     In *King*, the North Carolina Supreme Court examined the elements of superiority, influence, and trust to find that a de facto fiduciary relationship of "trust and confidence" existed between a prospective patient and surgeon and found an arbitration agreement void for four relevant reasons—all of which are firmly established here. *See King*, 369 N.C. at 466. While *King v. Bryant* addressed arbitration agreements, its fiduciary duty analysis applies with equal force to indemnification agreements that similarly attempt to shift legal responsibility away from the professional with superior knowledge and skill.

61.     First, like the patient in *King*, the Parents sought out AAG because of its special knowledge and skill in treating adolescent behavioral health issues, which they lacked. *Id.*, quoting *Black v. Littlejohn*, 312 N.C. 626, 646 (1985). Indeed, AAG marketed itself as having special expertise in adolescent behavioral health. The Parents relied on AAG's consistent representations affirming that purported expertise.

62.     Second, like the *King* patient, the Parents demonstrated their trust and confidence in AAG when they provided it with the girls' confidential medical information before their admission. *See King*, 369 N.C. at 466 (finding the patient "demonstrated sufficient trust and confidence in him to provide [the doctor] with confidential medical information" during the intake process). The Parents and the girls completed a comprehensive intake process with AAG. AAG also required the Parents to submit the girls' confidential medical information during its extensive intake process. AAG would only admit the girls after a personal evaluation and screening process conducted by AAG to determine if the girls satisfied AAG's screening criteria.

63.     Finally, in noting the superiority and influence imbalance, the *King* patient had "received a limited education and had little to no experience interpreting legal documents", unlike the surgeon. *See King*, 369 N.C. at 466. The girls were minors at the time of their admission to

AAG. The imbalance of power between minor children and a sophisticated corporate entity backed by private equity is even more pronounced than in *King*.

### 3. AAG's Intentional Acts Bar Contribution

64.     Even if AAG had not denied its own negligence (which it has) and even if it had not breached its fiduciary duty to the girls (which it did), contribution would still be barred because of AAG's intentional acts. "There is no right of contribution in favor of any tort-feasor who has intentionally caused or contributed to the injury or wrongful death." N.C. Gen. Stat. § 1B-1(c). The underlying Complaint alleges several intentional acts. These acts combine with AAG's negligence to color all of their causes of action. Accordingly, AAG cannot seek contribution for any of its claims because of its repeated intentional acts. Allowing contribution for intentional acts would eviscerate the policy behind § 1B-1(c) and reward deliberate wrongdoing.

## IV.     CONCLUSION

For all the foregoing reasons, AAG's Third-Party Complaint fails to state claims upon which relief can be granted and should be dismissed in its entirety with prejudice pursuant to FED. R. CIV. P. 12(b)(6).

**RESPECTFULLY SUBMITTED,**

/s/ *Ruth A. Sheehan*

RHINE LAW FIRM, P.C.
Ruth A. Sheehan, NCSB 48069
Email: ras@rhinelawfirm.com
Joel R. Rhine, NCSB 16028
Email: jrr@rhinelawfirm.com
1612 Military Cutoff Road, Suite 300
Wilmington, NC 28403
Tel: (910) 772-9960
Fax: (910) 772-9062

and

Gareth S. Purnell (Admitted *Pro Hac Vice*)
Simon B. Purnell (Admitted *Pro Hac Vice*)
**GRIFFIN PURNELL LLC**
2037 Airline Road, Suite 200
Corpus Christi, Texas 78412
(361) 262-1776
(361) 356-4348 Fax
gareth@griffinpurnell.com
simon@griffinpurnell.com
Service email: support@griffinpurnell.com

**ATTORNEYS FOR PLAINTIFFS/
THIRD-PARTY DEFENDANTS**

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 24th day of November, 2025, a true and correct copy of the foregoing document was filed electronically with the Court's ECF system for service to all counsel of record.

David L. Levy
Kristy M. D'Ambrosio
**GARDNER SKELTON, PLLC**
3746 N. Davidson Street
Charlotte, North Carolina 28205
dlevy@gardnerskelton.com
kdambrosio@gardnerskelton.com
*Attorneys for Defendants Asheville Academy for Girls, LLC (f/k/a Solstice East, LLC and Magnolia Mills School) and Wilderness Training & Consulting, LLC (d/b/a Family Help & Wellness)*

                                       */s/ Gareth S. Purnell*
                                          Gareth S. Purnell